JOHN R. C. GARDINER *vs.* MAYOR AND CITY COUN-
CIL OF BALTIMORE.

*Opening Streets—Award of Damages for a Lot, Part of Which Had Been Previously Dedicated—Conflicting Claims to Money Awarded for Land Condemned—Payment of Money Into Court—Sec. 827 of Baltimore City Charter—Mistake of Street Commissioners in Making Too Great an Award.*

When the commissioners for opening streets award a sum of money for the fee-simple interest in certain land taken for a street to A. B. "or such persons as may be legally entitled thereto," and it afterwards appears that part of such land had been previously dedicated to the public, then A. B. is not entitled to the whole amount awarded, and the Commissioners may subsequently make a valid award for the part of the lot not so dedicated.

In 1849, an irregular lot of ground in Baltimore City comprising a part of what afterwards became the bed of Little Ensor street, together with adjacent parcels, was conveyed to one Wolf. In 1857 a municipal ordinance was passed providing for the condemnation and opening of a street 40 feet wide through this lot. This was done at the solicitation of Wolf, who himself paved the street (called Little Ensor street), and built a house abutting thereon, which was numbered 184 H. avenue. In 1875 Wolf died leaving a will by which he devised to his daughter Olivia, "in fee No. 184 H. avenue, my homestead." She, in 1889, conveyed to the appellant the property in question by a deed which described it in the

same way in which it was described in the original deed of 1849, by which it was conveyed to her father, but added the words "which property passed to said grantor under the will of M. Wolf, 'to my daughter Olivia, No. 184, my homestead.'" In 1892 an ordinance was passed providing for the enlargement of Ensor street and a change in its direction. Under this ordinance a part of the bed of Little Ensor street was to be used and also adjacent land that was not within the lines of that street. Appellant claimed to be entitled to damages as the owner of all the land taken for the new street which was within the lines of the deed to Wolf, including that which had been used for the bed of Little Ensor street. *Held,*

1st. That so much of the original lot as had been used as part of the bed of Little Ensor street had been dedicated and given to the city by the former owner, Wolf, and this dedication was accepted by the ordinance of 1857.

2nd. That the devise by Wolf to Olivia did not embrace any part of the original lot that was included in the bed of that street.

3rd. That the appellant as grantee of Olivia is entitled to damages upon the opening of the new Ensor street only for so much of the lot conveyed to him as had not been used as a part of the bed of Little Ensor street.

Sec. 827 of the Charter of Baltimore City provides that whenever property shall have been condemned for the use of the city and on account of conflicting claims or any other cause, the money damages awarded therefor cannot be safely paid to any person, the Mayor and City Council may file a bill in equity, under which the money may be paid into Court and be treated as a tender to the person found to be entitled. A bill filed under this provision alleged the passage of an ordinance for opening a street through certain land and the award by the Street Commissioners of a certain sum to the defendant for the fee-simple interest in a designated lot of ground taken for the street, but that it appeared that a portion of said lot had been previously dedicated by a former owner to the city; that afterwards the Commissioners valued the part of the lot that had been so dedicated at a certain sum and tendered the balance of the amount first awarded for the whole lot to the defendant who refused to accept it, and that defendant was only entitled to the amount tendered, etc. The Court ordered the damages assessed to be paid into Court to abide the final adjudication of the contention as to the ownership of the lot and appointed a trustee to convey the same to the city. No appeal was taken from this decree and it therefore became conclusive. The defendant's demurrer to the bill was overruled, no appeal being taken therefrom, and the final decree below upheld the claim of the city. *Held,*

1st. That the bill states a case within the scope of sec. 827 of the City Charter and the Court had jurisdiction to make the decree appealed against.

2nd. That the bill is not multifarious in making landowners other than this defendant parties, because its single object is to make effective the opening of this street.

3rd. That the object of the bill is not to determine the title to the land but the ownership of the money which had been substituted for the land.

4th. That the first award of the Commissioners is not conclusive as to the right of the defendant to the whole sum thereby awarded.

Appeal from a decree of Circuit Court No. 2, of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*James Hewes*, for the appellant.

February 23, 1889, John R. C. Gardner and Sarah Ann Gardner, his wife, purchased a piece of land fronting fifty-four feet on the west side of Harford avenue, near Chase street, in said city, from Olivia Wolf, after they had had it surveyed by Martenet, and had found that it embraced the whole of the lot, piece or parcel of ground granted and conveyed by William Price and his wife to Marcus Wolf, July 27, 1849, improved by a brick dwelling known as No. 184, now 1036, which was devised by Marcus Wolf to Olivia Wolf and described and designated in his will as No. 184 Harford avenue, "The Homestead," meaning his "dwelling place, with that part of his landed property which is about and contiguous to it." *Webster's Dictionary, Homestead.*

The Mayor and City Council, by virtue of the power vested in it by statute, ch. 226, Acts of 1838, and pursuant to Ordinance No. 44, approved April 4, 1892, condemned a part of said land, and the Commissioners for Opening Streets awarded the Gardiners $1,608 damages and assessed their benefits at $110. But when their attention was called to the abstract and notes of the examiner of titles and his statement that the Gardiners owned the alleged street absolutely, they made a new assessment and Gardiners' was changed to $2,801.33 as damages, $223 benefits, leaving net $2,578.33 due them for

that part of their land so taken for the opening of Ensor street
between Eager and Chase streets, thus increasing the damages
$1,193.33 and the benefits $113.   See *Abstract, Street Book
and Plat*; *Acts of 1838*, ch. 226; *M. & C. C. Ordinance No.
10, 1841.*

No appeal was taken by any party from the acts of said
Commissioners, so they became final and conclusive as to the
title of the Gardners to said land, at that time, and the dam-
ages suffered by the taking of the same.   *City Code of '92*,
Art. 48, secs. 10-16; *Moale* v. *Baltimore*, 5 Md. 322; *Norris*
v. *M. & C. C.*, 44 Md. 608; *Story* v. *Ulman*, 88 Md. 245;
*Constitution of Maryland*, sec. 40, Art. 3; *Declaration of Rights*,
Art. 23; *XIV Amendment Const. of United States; Lewis'
Eminent Domain*, vol. 1, secs. 237 *et seq*, 253 to 256, 658 *et seq*;
*Stuart* v. *Palmer*, 74 N. Y. 190, 191; *Ulman* v. *M. & C. C.*,
72 Md. 587.

By Ordinance No. 57, approved July 2, 1897, the appro-
priation was made to pay the aforesaid damages among others,
but the examiner of titles refused to certify to the Gardiners'
title to said land, although the Gardiners had neither done
anything themselves nor permitted anything to be done
whereby their title could be affected since the award by the
Commissioners for Opening Streets.   After repeated demands
made by the Gardiners upon the examiner of titles for the cir-
tificate, and the City Comptroller for the money, at length, in
1898, resort was had to *mandamus* proceedings, resulting in
dismissal of the petition on the grounds that without a waiver
of the examiner's discretionary power—as in the *Ulman case,
supra, mandamus* will not lie against such officer, and the ex-
aminer refused to waive his discretion in this case, although
the facts were alike.   Then came the proceedings in the
equity Court; bill, supplemental bills, demurrer, interlocutory
decree, petitions, taking of testimony and exceptions to same,
and final decree, which, being in favor of the plaintiff, the de-
fendant has appealed, and the case comes here now for review.
There was no appeal from the interlocutory decree, as it was
to the effect that the Gardners should get the amount of the

award for which they are contending; they had no reason to appeal from such decree, even if an appeal therefrom would lie.

1. This is a Federal question, as it involves a violation of the defendant's rights under the Fourteenth Amendment.

2. The demurrer to the bill and the amendments brings up for decision the question of the sufficiency of the same to make out a case for an equity Court.

3. Whether there is jurisdiction in the premises. ·

4. If yea, then is it not limited absolutely to the disbursement of the money as finally awarded by the Commissioners for Opening Streets.

5. The words of the final decree read the case out of Court, and clearly show that the Court has no power conferred upon it to pass such a decree.

It shows, too, that the cause is one to try the title to land, and declares that the title to the land that Gardners bought and have paper title to is in the plaintiff, the Mayor and City Council of Baltimore. If it does not, then, what becomes of the part of the lot fronting Harford Avenue? If the Act of 1892, ch. 165, to which the plaintiff looks for authority to make this defendant answer, can be construed to confer jurisdiction upon an equity Court to decide who has title to land regardless of the decisions of this Court on the subject, then the Act is unconstitutional and void. *McCoy* v. *Johnson,* 70 Md. 493.

Equity Courts sometimes, under some conditions of facts, have jurisdiction where the title of land is involved, as in a bill to quiet title, but cannot be maintained without clear proof of both possession and legal title in plaintiff. *Polk* v. *Pendleton,* 31 Md. 125; *McCoy* v. *Johnson,* 70 Md. 493; *Textor* v. *Shipley,* 77 Md. 478; *Keys* v. *Forrest,* 90 Md. 135.

The plaintiff in this case has neither the one nor the other, having invariably treated Gardners as the owners; notifying them to abate nuisance when water would collect and lie in big puddles or ponds in the centre and on the sides of this land, and in other ways. The note in the examiner of titles, record, says that the title in fee to this land is in the Gardners'

and that the Mayor and City Council has never done anything to acquire title, and has never exercised supervision and control over it as a public street.

This bill does not allege that the plaintiff has the legal title and the possession of the land in question, and even though it did, it was too late to make such a claim. The proper time was when condemnation proceedings were in progress, and then Gardners could have had a jury trial, which is guaranteed to them by the Federal Constitution and by the State Constitution, and by the law of 1838 and the ordinance of the plaintiff, the M. & C. C. of Baltimore City.

There was an ordinance passed in 1857 to change the bed of Ensor street as laid down on Poppleton's plat and as now condemned and open by the ordinance of 1892, but nothing was done under that Ordinance of 1857, and nothing occurred whereby Wolf's, now Gardiners', or any other land was acquired by the plaintiff under that ordinance. It obviously was a fake, and absolutely null and void. It was of material value to Marcus Wolf to have his property south of "The Homestead" protected against condemnation proceedings for opening Ensor street as laid down on Poppleton's plat, and he felt warranted in contributing something to bring that about; but if it could be argued that the consideration for cessor of this land was the condemning and closing of Ensor street, as laid down on Poppleton's plat, and the opening of this 38½-foot street, then the consideration having failed by the acts of the plaintiff the title to this alleged street fails. If the Ordinance No. 61, 1857, is valid in part, it is valid throughout; and contrariwise, if it is bad in part it is altogether bad, because it is an entire thing, or must be accepted or rejected in its entirety.

Ordinance No. 61, 1857, was not enough to condemn and open the alleged street and take the property, even had it been properly drawn and good as a preliminary step. *Baltimore City Code, 1879*, Art. 47, secs. 10-11; *Baltimore City Code, 1893*, Art. 48, sec. 10; *Acts of 1838*, ch. 226.

There was no conveyance from Marcus Wolf to the plain-

tiff, at that or any other time, for a substantial or for a nominal consideration; and the evidence shows that Marcus Wolf was a shrewd business man, and a man of property, and expected to be paid for this alleged street bed if ever the plaintiff would condemn and open it over the proposed changed course, and if not, then it was private property and to be treated as though nothing had been done. There was no dedication of the land as set out in the interlocutory decree.

If the city gained any rights by the acts of Marcus Wolf they were inchoate rights and defeated by failure to avail itself of them in time; that is, before the devise to Olivia of this alleged street bed. The public acquired no right to the use of this land as a street. There was no way out to any street after entering from Harford avenue, except over hummocks and across ravines, with a sign at a deep bunker—"dump here;" and thence on over Vickers' land to Chase street; and at the eleventh hour this plaintiff paid Vickers. One man, Oldgart, it is said, paid Wolf six dollars per annum for the privilege of driving over this alleged street to the back of his place.

In this connection it would be instructive to glance at Ensor street as opened by the ordinance of 1892—and this alleged street bed—and review the ordinance of 1857 to condemn and close the Ensor street, as now just opened, and changed the bed so as to bring a 60-foot street out through a 38½-foot opening to Harford avenue, over this land in dispute, and at right angles to the course of Ensor street as laid down on Poppleton's plot, and then consider the inaction of the plaintiff and the notes of the examiner of titles, and then the conclusion follows that the ordinance never was taken seriously by the plaintiff, and there is no other dedication claimed by it.

This is not and cannot be an interpleader proceedings; the principal element is wanting; the indifferent stakeholder threatened with two or more suits in respect of the same subject-matter and maintaining a position of continuous impartiality; and this plaintiff cannot maintain with respect to this subject-matter a suit in the nature of an interpleader.

*Phelps' Equity*, secs. 100 and 230; *Miller's Equity*, sec. 722; *Nat. Park Bank* v. *Lanahan*, 60 Md. 477—514. Only one amusing feature to this unnecssary and protracted litigation presents itself, and that is, were the plaintiff to succeed, the back part of this alleged street would go to it and the front remain Gardiners, because only the back was condemned.

The claim made below by the plaintiff that if it was not entitled to this land, and the money awarded to pay for it, then the heirs of Marcus Wolf are entitled to it, is introduced for the sole purpose of dismissing it; the plaintiff could not exercise its powers of eminent domain for the benefit of individuals, and should not be permitted to condemn a portion of an individual's land and then withhold the money awarded to the individual and eject the individual from the whole. *Van Witzen* v. *Gutman*, 79 Md. 409; 1 *Lewis, Em. Dom.*, ch. 9, sec. 237; *Townsend, Grace & Co.* v. *Epstein*, 93 Md. 550.

*Jas. W. McElroy* and *Olin Bryan* (with whom was *Wm. Pinkney Whyte*, on the brief), for the appellee.

This ordinance of 1857, passed for the condemnation and opening of Little Ensor street, heretofore referred to in this brief, provided the way known to the law at that time for opening streets. The office of Commissioners for Opening Streets was not created until the year 1866 (see Ordinance No. 26 of that year, approved April 3). This ordinance was passed in pursuance of authority from the Legislature. *City Code Public Local Laws 1860*, Art. 4, sec. 85.

Since the passage of that ordinance in 1857 and by reason of the proceedings thereunder, Little Ensor street became and has been used ever since as a public highway of the city and is now physically a street, the greater part of it having been graded and paved in the lifetime of Marcus Wolf, under whom all the parties claim. On the 27th of July, 1849, a certain William Price and wife conveyed to Marcus Wolf an irregular lot of ground, by metes and bounds, fronting about 56 feet, on what is now known as Harford avenue, with a depth of 1.20 feet, following the same description of said lot, as it orig-inally was described as far back as 1794.

Marcus Wolf, a prosperous man in business, built for him-self and family (after Little Ensor street was opened) a *"homestead"* on part of the ground which he acquired from Price, fronting about 27 feet 7½ inches on Harford avenue. He lived there the balance of his life and died some time in 1875 in the *"homestead,"* which was street numbered at the time as No. 184 Harford avenue, leaving a will, which was duly probated, wherein he devised to his daughter, Olivia, among other things (by clause thirdly), *"in fee No. 184 Har-ford avenue—my homestead."* Olivia Wolf, daughter of Mar-cus, and devisee under his will, sold the property to the Gardiners, on the 23rd day of February, 1889, by the same description as contained in the Price deed, *modified by the last clause*, at her own instigation, by inserting at the end of the description, the following words, viz: *"For my daughter, Olivia, No. 184, my homestead,"* meaning the property sold and which she only intended to convey; words inserted into the deed by Olivia herself, because as she says that she never intended by any description in that deed to convey to the Gardiners any portion of the bed of Little Ensor street.

It must and will be conceded that the Gardiners could not take, nor could Olivia Wolf convey as to this property, the only piece which the Gardiners bought, any more than what Olivia herself took under her father's will, viz: *"In fee No. 184 (Harford avenue) my homestead."* The description in the Price deed, old as it was, could not be followed even by a sur-veyor. Gardiner himself admits this.

Convincing reasons exist why this description could not possibly be followed, and therefore Olivia Wolf could not have intended to convey to the Gardiners all that ground em-braced in that description.

In the first place, many years before the Gardiners bought their property, Marcus Wolf, father of other children, besides the said Olivia, had necessarily changed the description, when he, with Wilcox and other parties, petitioned the Mayor and City Council of Baltimore to take a considerable part of the whole ground, which he had gotten from Price, for the bed of

Little Ensor street. Remembering this when he came to make his will, instead of leaving Olivia " *the same property which he had purchased from Price,*" by language which he undoubtedly would have used had he not previously disposed of some part of it as a city street, he devises to her "*No. 184, my homestead,*" meaning beyond question the house he had built for himself and family, in which he lived the latter years of his life and in which he died. His expression, "*my homestead,*" it is respectfully submitted, carried with it the dwelling and so much of the ground only as was appurtenant thereto, as it was improved with regard to the visible streets.

That Marcus Wolf himself considered Little Ensor street, a city street, is evident because he built the homestead *with one of the main entrances facing on that street.* Now then, how does it lie in the mouth of the appellant to set up any greater claim to the ground in question than what Marcus Wolf admitted himself, by the language used for Olivia when he executed his will? Marcus Wolf himself (being the right owner of all) had destroyed the landmarks in the Price deed description, by other changes he had made in improving the property.

Olivia Wolf would not sign the exhibited deed till those words had been inserted above referred to, viz : "*For my Daughter Olevia, No. 184, my Homestead.*" The action of the Commissioners for Opening Streets, in making an allowance to the Gardiners for more ground than they owned, is and was an error and a mistake, no matter how made, and the city has every right to correct or have corrected any error by which it might be called upon to pay more than the claimants in any case and, of course, in this case, are entitled to. When the time arrived to pay the Gardiners, the then law officer of the city, *the Examiner of Titles,* acted and refused to sign the certificate of damages to them. In this he was upheld by JUDGE PHELPS, to whom the Gardiners applied for a *mandamus* to compel the payment, which writ that learned Judge, after a patient hearing, refused. For more than three years after this refusal by JUDGE PHELPS, the Gardiners stood idly by, although they had their remedy against the city at law

and did nothing, and would do nothing, so the city was compelled to file the bill in this case under the Special Act of Assembly referred to in the bill of complaint, which is not at all a bill of interpleader, for the reason that the city is not a mere stakeholder, but on the contary, is claiming a part of the fund awarded as its own—a feature entirely inconsistent with the law governing bills of interpleading, (else had not the bill been filed under this Act the city was without a remedy.)

It is conceded that the award of the Commissioners in this case *so far as the figures heretofore given* are concerned, is conclusive and binds all parties, but to say that the award is "final and conclusive" in the sense that the Gardiners and the Gardiners only, are to be paid the whole net award of $2,578.33, when they could not deliver and had not title to the bed of Little Ensor street, embraced in Lot J, is a proposition of law not conceded, but (as being inequitable) is *strenuously* denied.

The award of the Commissioners on its face reads : "To Mr. John R. C. Gardiner and Sarah A. Gardiner, *or such person as may be legally entitled thereto*," for the fee-simple interest in lot designated on the plat aforesaid by the letter J.

Who was to determine this question, *"or such persons as may be legally entitled thereto*," but the city law officer, when the time came to make his final examination of titles ? (Otherwise his final examination would be a stultification.) Certainly the Commissioners for Opening Streets had no such power, nor any one else except himself. The city at the time this award was made *had no right of appeal, and could only protect itself against this error and mistake through its law department* on final examination of titles. (*Balto. City Code of 1893*, Art. 50, sec. 60.)

No damage or injury whatever has or can come to the Gardiners in this case (by giving them what their grantor, Olivia, had to give them), since the sum of money which the city is willing and has always been ready to pay them for what was taken for this street from them, namely, an insignificant stable and a small part of their yard, is abundantly com-

pensatory. They are reaching out for the bed of a city street, which has been such since 1857. The city has its street sign on this "Little Ensor street," and has had it so for years. (Whether the sign read "Wolfe street" or "Ensor street," makes no difference, being a city sign), ever since Gardiner has lived in his house, and even before that time, in full and *daily view of the Gardiners*, without the slightest complaint from them, for they well knew that the city owned it and not they. As additional evidence that the Gardiners knew they had and have no claim to any part of the bed of Little Ensor street, is that it has never been assessed to them and *they have paid no taxes thereon*, because it is a city street, acquired under the Ordinance of 1857.

We say, it is not alone a question of mere dollars and cents, but of the actual title to the land, comprising the entire street bed, under the Ordinance of 1857, and unless, therefore, the claimant can deliver a substantial title to Lot J he is not entitled to a substantial payment ; and to the extent that he cannot so deliver, to that extent he is not entitled to be paid, even though the land to which he has good title to deliver has been included within the same description with other land which is not his to deliver. He is entitled to be paid, in other words, for that which (being his) is taken from him under the condemnation proceeding, and for nothing more. In equity, it makes no difference whether the other part (not being his) is already claimed by the city or is claimed by some third party ; in either case the city would be asked to pay twice over for the proposed street bed ; and the proposed street bed is the sole object (and subject) of the condemnation, and all proceedings thereunder.

As bearing on Lot J, the question of previous dedication is a very serious question. The whole of Lot I, an adjoining lot, has been surrendered to the city (under the proceedings by the Commissioners for Opening Streets in the present matter) by Alonzo L..Wolf, who has been paid, as per the agreement, "Exhibit Wolf's release." The defendant, Gardiner, is here claiming the whole of Lot J—but can show no title

thereto at all which is not to them derived by the deed to them from Olivia Wolf.

Alonzo L. Wolf and Olivia Wolf are brother and sister, devisees of specific lots (by numbers, as houses are numbered on Harford Ave.), under the will of Marcus Wolf, their father ; but said Alonzo and Olivia are but two out of four of the children and residuary devisees of said Marcus Wolf, their father.   So that the first question is as to what was specifically devised to them, Alonzo and Olivia severally, apart from the residuary estate devised to them in common with their other brother and sister—four in all, of which Olivia represents one-fourth.   The defendant Gardiner intimates that we are "attempting to strike down" the deed from Olivia, but, as the city has a deed from Alonzo, whose title is from the same source and will under which Olivia took her title, it becomes apparent that there is no "attempt to strike down" by requiring due reference (which is actually inserted in Olivia's deed to Gardiner and wife) to the will of Marcus Wolf.   It would indeed be a "striking down" upon the part of the Gardiners, to deny the full effect of this reference—when the fact is made known that Olivia had no other title at all in the premises, except (as her deed shows), under that very will of her father. The city does not deny the title of Gardiner and wife to "*my homestead*," for that was specifically devised by Marcus, the father, to Olivia, the daughter, (and so was properly the subject of Olivia's deed to Gardiner and wife, as exhibited); but the city does most strenuously deny the title of the Gardiners to so much of Lot J as is *outside* of "*my homestead*," to wit, so much of Lot J as lies within the bed of "Little Ensor street," 40 feet wide, as herein claimed to have been dedicated by Marcus Wolf (the father of Olivia), as far back as the years 1857–1858—which it was not within the power (or indeed patent intention) of Olivia to convey to Gardiner and wife by her single deed.   We say, whatever and howsoever described in her deed to Gardiner and wife, Olivia could not and does not (as the reference inserted in her deed shows), convey to Gardiner and wife, what her father, Marcus, did not to her

specifically devise, viz.: "*No. 184 Harford avenue, my home-stead,*" even if the description in said deed had included much more ground, and by a description certain in all its parts. As a matter of fact the description (see the testimony) is very un-certain, and seems to be borrowed from the old deed to Mar-cus Wolf, aforesaid, but wholly ignoring the will of Marcus himself. And this is, therefore, surplusage, in fact and in law —and goes for nothing. Deeds must be certain, first for all ; and it is *certain* that "my homestead" only is the subject of Olivia's deed to Gardiner and wife.

For many years before 1857, Marcus Wolf had owned Lots (I and J) and other lots thereto adjacent, in one body of land —though by several descriptions, all those lots were his, and *under Marcus Wolf alone* do the Gardiners claim (through Olivia Wolf alone) whatever title (good or bad), they have.

By Ordinance No. 61, passed 8th day of October, 1857, to change the bed of Ensor street—"Ensor street"—(that is the space now called "Little Ensor street"), was provided to be "condemned" 40 feet wide, and the evidence shows that this was done with the consent of Marcus Wolf, the real owner. Shortly afterwards it was graded and paved, with paving which lasted even until this bill was filed, at the ex-pense of Marcus Wolf, the real owner. So we say, it does not lie in the mouth of any one claiming under Marcus Wolf to deny: (*a*) that he was the real owner; (*b*) that said "condemnation" was perfect; (*c*) that Marcus Wolf, in bind-ing himself, bound all thereafter to claim under himself. For that ordinance contains the specific description of the land "condemned," and the opening, grading and paving was phys-ically apparent to Marcus Wolf himself, so to the Gardiners themselves. Then Marcus Wolf built "*my homestead*" abut-ting on said paved 40-foot street, enclosed it with fences, and lived and died in the said "*my homestead.*" That same Mar-cus Wolf devised "*my homestead*" specifically to his daughter Olivia ; and it is from said Olivia (taking under her father's will), after her father's death, after he had died seized, that Gardiner and wife derive whatever title they have. And shall

they now be allowed to say that "Marcus Wolf had no right"
to do with his own as he pleased, while they (claiming under
him) can do as they please?    As in his name, and as not in
his name?    Now the disposal of Lot J (according to Gardi-
ner's contention) would be a most serious damage to Lot I,
which the city has acquired from Alonzo ; since if Lot J be
allowed to swallow up the major part of "Little Ensor street,"
(which is that for which the Gardiners are here now contend-
ing) then Lot I will have its side front upon a narrow alley
and not upon "Little Ensor street," 40 feet wide ; and the tri-
angle of Lot I (not used for the new or wider "Ensor street"
66 feet wide) will lose the better part of its value.    Does that
matter to the appellant?    He will say "that is the city's look-
out ;" but truly it is the "lookout" of all who claim under
Marcus Wolf's will—which disposes of the houses on Har-
ford avenue by numbers, (as the houses are built) and so rec-
ognizes "Little Ensor street" as it was graded and paved at
the expense of Marcus himself.

PEARCE, J., delivered the opinion of the Court.

This is an appeal by John C. R. Gardiner from a decree of
the Circuit Court No. 2 of Baltimore City, passed May 21st,
1902, in the case of the Mayor and City Council of Baltimore
against John C. R. Gardiner and others.    The bill was filed
under the Act of 1892, ch. 165, now sec. 827 of the New
Charter of Baltimore City, which is as follows :    "Whenever
any property shall have been condemned in any form of pro-
ceeding for the use of the Mayor and City Council of Balti-
more, and in consequence of infancy, insanity, absence from
the city of any persons entitled to receive any money awarded
in such proceeding, *conflicting claims, refusal to accept*, or any
other cause, such money cannot be reasonably or safely paid
to any person or persons, it shall be lawful for the Mayor and
City Council of Baltimore to file a bill or petition in any Court
of equity in the city or county where the property is con-
demned, or any portion thereof lies, and whenever such Court
shall be satisfied for any of the persons aforesaid that such

money ought to be paid into such Court, it shall pass such decree as it shall deem proper, and the payment of any money into Court under such a decree or order shall be considered in all respects equivalent to a tender thereof to any person or persons entitled to such money, and who may be made a proper party to such proceeding."

The original bill filed set forth that under Ordinance No. 44, approved April 4th, 1892, land was condemned to open Ensor street from Eager street to the south side of Chase street, and that damages and benefits were awarded thereunder to the various owners, or *alleged owners*, of the land condemned; and that among these, damages were awarded to John C. R. Gardiner and Sarah R. Gardiner, his wife, as joint tenants, or *to such persons as may be legally entitled thereto*, for the fee-simple interest in lot designated on the plat accompanying this opinion by the letter J, in the sum of $2,801.33 less benefits assessed on lot 44 on plat B returned by the Commissioners, in the sum of $223, the net damages in their case being $2,578.33, for the *fee-simple interest in the lots aforesaid.* But that in fact the said Gardiner and wife were not entitled to any allowance for that part of Lot J which comprised the bed of Little Ensor street (as shown on the plat accompanying this opinion) because the same was before said condemnation, a dedicated highway, and that said Gardiner and wife had, by petition in the Baltimore City Court, asked for a writ of *mandamus* to compel the then city official, known as the Examiner of Titles, to issue a certificate for the net amount of said damages, which the said Baltimore City Court refused to order. The bill further alleged that said portion of Lot J previously dedicated as aforesaid, was valued by the Commissioners for Opening Streets at $1,193.33, and that the true and just amount due said Gardiner and wife under said condemnation was $1,385 arrived at as follows:

| | | |
|---|---:|---:|
| Total award | | $2,801 43 |
| Deduct benefits | 223 00 | |
| Deduct value of bed of Little Ensor | | |
| | | 1,416 33 |
| Street dedicated | 1,193 00 | |
| Net | | $1,385 00 |

and then tendered Gardiner and wife said sum of $1,385, (which they refused) and the bill further alleged that they could not reasonably or safely pay said award to said Gardiner and wife. The prayer of the bill was that the net sum alleged to be due Gardiner and wife, and the other parties to the biil, (all of which have since been adjusted) be paid into Court to the credit of the cause, and that the defendants answer the bill and adjust their respective demands.

A few days later an amended bill was filed, under leave of Court, asking that the whole amount awarded to Gardiner and wife (less benefits), viz: $2,578.33, be allowed to be deposited in Court. Gardiner and wife demurred to the original and amended bill, 1st, because they alleged the bill did not state a case within the operation of sec. 827 of the New Charter; 2nd, because the bill was multifarious in making the other land owners mentioned, parties to the cause; and 3rd, because the bill did not state any case entitling the plaintiff to relief in equity. This demurrer was, after argument, overruled by JUDGE WICKES on December 8th, 1900, and correctly as we think, for reasons which will hereafter appear.

Gardiner and wife then answered the original and amended bill admitting the condemnation proceedings set forth in the bill, but denying that there had ever been any dedication of that part of Lot J, comprising the bed of Little Ensor street, or that the Commissioners for Opening Streets had ever valued that part of said lot so dedicated, at $1,193, or at any other sum, and averring that at the time of said condemnation they had a fee-simple title to the whole of Lot J, and filed as an exhibit a deed to them from Olivia Wolf, dated February 23rd, 1889, embracing the whole of Lot J within its lines. The answer also alleged that plaintiff was estopped from disputing their title to Lot J, and to the whole of the award by Art. 48 of the City Code of 1893, and that the decree prayed would operate as a taking of their property without due process of law, in violation of the Fourteenth Amendment of the Constitution of the United States. The bill and answer were considered without testimony and on December 8th, 1900, the

## EXPLANATION OF PLAT.

Lot J as described by the Commissioners is shaded light on the accompanying plat.

The Homestead Lot is enclosed from B to L, to K, to H, to G, thence to B, and the improvements on it are marked " 3 S. B. D. and 2 S. B. B. B." meaning 3-Story Brick Dwelling and 2-Story Brick Back Building and in the rear 2-Story Brick Stable.

The part of Lot J marked with a broad X is the bed of Little Ensor street within the lines from B to W, to T, to M, thence to B, and is beyond the present opening.

Lot I includes the whole lot shaded dark and the land to the South thereof, part of said Lot I being within the bed of Little Ensor street.

Little Ensor street, as laid out by the Ordinance of 1857 begins at A to B, to C, to D, to E, to F, thence to A, within the black lines.

The lines E to F, to R, to S, to Q, and thence to E, show the 66 feet width now taken for the new opening of Ensor street.

Court, JUDGE WICKES, being of opinion that the sums of money mentioned in the original and amended bill, should, under sec. 827 of the New Charter, be paid into Court as prayed, passed a decree that said sums be paid into Court, subject to its order, " in full settlement and satisfaction of all claims and demands of all parties against the said Mayor and City Council growing out of the condemnation of said lots   *   *   *   *   but it appearing that there is a contention between the Mayor and City Council and the said Gardiner and wife as to the actual ownership of a portion of the fee-simple estate in Lot J,   *   *   * it is adjudged, ordered and decreed, that the said net amount of $2,578.33 awarded for the fee-simple interest in Lot J shall await and abide the final adjudication of the said contention over Lot J."

This decree further appointed James W. McElroy, trustee, to grant and convey to the Mayor and City Council all the lots condemned as aforesaid, and such conveyance was accordingly made.    No appeal has ever been taken from this decree which was passed December 8th, 1900, and is consequently by lapse of time, final and conclusive as to every matter therein determined, provided the decree was within the jurisdiction of the Court.    *Barrick* v. *Horner*, 78 Md. 253.   We do not doubt that the Court had full jurisdiction to pass this decree.

The allegations in a bill determine the question of jurisdiction, and the true test in all cases is whether a demurrer will lie to the bill.    *Tomlinson* v. *McKaig*, 5 Gill, 276.   The allegations of this bill state a case clearly within the scope of sec. 827 of the New Charter, and there can be no doubt of the power of the Legislature to make that enactment.   The bill is not multifarious, since its object is the single one of making the condemnation under the ordinance for opening Ensor street, effective, and all of the parties to the cause are interested in that condemnation.    The third ground stated in the demurrer, we understood from defendant's argument, to mean that the cause is one involving title to land, which it is well-settled cannot be tried and determined in equity.    But we think it is plain there is no question of title to land in this case.

Under Ordinance No. 44, approved April 4th, 1892, the Mayor and City Council condemned and opened Ensor street from Eager street to the south side of Chase street as shown on the plat in this case, and awarded to Gardiner and wife, as already stated, net damages of $2,578.33 upon the supposition that they owned the whole of Lot J. When this award was made, the city had no right of appeal (Baltimore City Code of 1893, Art. 50, sec. 60), but no money could be paid on account of any condemnation without a certificate from the Examiner of Titles that the person or persons claiming the payment of any money therefrom, are the owners of the property for which such money was awarded, and when these proceedings were submitted to the Examiner of Titles he refused to give such certificate to the Gardiners, because, as he stated in his testimony, he discovered that they did not own that part of Lot J which constituted the bed of Little Ensor street. Thereupon the Street Commissioners valued and assessed that part of Lot J (which it will hereafter appear had been previously condemned for the use of the city), at $1,193, and tendered the Gardiners the residue of the award made to them, viz: $1,385 which they refused to receive, and sometime in 1898 filed a petition for a *mandamus* compelling Mr. Story, the Examiner of Titles, to certify that they were the owners of the whole of Lot J, and were entitled to the whole of the award therefor, and also compelling Mr. Fenhagen, the City Comptroller, to pay that amount, but this was refused by JUDGE PHELPS, and thus the matter stood until this proceeding was instituted.

Condemnation proceedings are proceedings *in rem*, and bind all persons interested in the *rem*, even though not technically parties to the proceeding. All questions of title to the *rem* are transferred to the money awarded, after a valid and final condemnation. Here the city could not, under then existing law, appeal, and the Gardiners did not within the time allowed them for that purpose. This case is therefore one of valid ·condemnation, and the question is no longer one of title to land, but of title to money substituted for land. As stated· by

this Court in *Norris* v. *Mayor and City Council of Baltimore*, 44 Md. 604, where the question was whether an assessment for damages carried interest from its date, the condemnation proceeding might be abandoned at any time before actual payment of the amount assessed, "and until that time no title to the property condemned vests in the corporation.  *  *  But when this sum is paid, or *tendered, the title vests."*

We are of opinion therefore, the Court had jurisdiction, and that the demurrer was properly overruled.

It was to just such a situation that sec. 827 of the New Charter applied, and the decree of December 8th, passed on the overruling of the demurrer, is in full conformity with the provisions of that section.  Nor is that decree open to revision on this appeal.  In *Hopper* v. *Smyser*, 90th Md. 378, we held that a decree which exonerated certain lots of land from sale under a certain mortgage, until the exhaustion of other mortgaged properties, was in the nature of a final decree, and not open for revision under sec. 26 of Art. 5 of the Code, but only upon appeal directly therefrom under sec. 24 of Art. 5.

Coming next to the consideration of the decree of May 21st, 1902, passed by JUDGE WICKES, awarding to Gardiner and wife $1,385, being the sum tendered them by the Mayor and City Council, and awarding the residue of the whole award $1,193, to the Mayor and City Council, a brief review of the testimony will suffice to show the correctness of that decree.

Under an ordinance approved October 8th, 1857, the City Commissioner was authorized and directed to condemn and open Ensor street from Chase street to Harford avenue, as shown on the plot by the letters A, B, C, D, E, F.  The evidence shows that this was done at the earnest solicitation of Marcus Wolf, who was then the owner of Lot J, and also of the adjoining lot marked 184 on the plot.  His son, Alonzo Wolf, and his daughter, Olivia Wolf, both testified to this fact. Olivia says her father paved that part of Lot J which constituted the bed of Little Ensor street and *gave* it to the city in

order to improve his property ; and Alonzo says a deed was prepared for this bed of the street to the Mayor and City Council, and he is sure his father executed it.   They both say the street after being paved was always used as a street by the public, and that the city authorities put up a sign at the corner of Harford avenue and that street, bearing on it the words "Ensor street."   Marcus Wolf died in 1875, and by his will, made July 29th, 1875, devised to his daughter Olivia, "my hometead No. 184 on the northwest side of Harford avenue," without otherwise describing it.   Wm. P. Price and wife by deed of July 27th, 1849, conveyed to Marcus Wolf a lot on the northwest side of Harford avenue, the metes and bounds of which embraced lot 184, and also Lot J as shown on the plot, and nothing more.   In 1857, Lot J was conveyed, or given, by Marcus Wolf to the city and from that time up to the condemnation of 1892, and the institution of these proceedings, has constituted part of the bed of Little Ensor street, and neither Marcus Wolf in his lifetime, nor Olivia Wolf, since his death, ever claimed any ownership or interest therein.

On February 23rd, 1889, Olivia Wolf sold and conveyed to John C. R. Gardiner and Sarah A. Gardiner, his wife, a lot on the northwest side of Harford avenue by metes and bounds, designating it as the same devised by Marcus Wolf "to my daughter Olivia ———— No. 184, my homestead ;" but this conveyance followed the metes and bounds contained in the deed from Price and wife to Marcus Wolf, and thus embraced that part of Lot J which had been dedicated in 1857, and had since constituted a part of the bed of Little Ensor street. Olivia Wolf testified that the house on lot 184 fronted on Little Ensor street, and that after the dedication and opening of that street, the homestead did not include any part of the bed of that street.   Gardiner testified that when he purchased the dwelliug and lot from Olivia Wolf, she gave him the Price deed "to go by," and that he had the property surveyed and would not have purchased it "without getting the old deed" and that Olivia Wolf told him if the street was ever opened, he would be paid for the street.

Olivia Wolf testified, in rebuttal, that the street was never mentioned by her to Gardiner, and that she knew the homestead devised to her by her father did not include any part of Lot J, and that when she executed the deed to the Gardiners she did not know it included any part of Lot J—and that she would not have attempted to sell what she knew she did not own—and further, that she never knew until this controversy arose, that he claimed to have purchased any portion of the bed of the street. Gardiner testified on cross-examination that his father-in-law advised him to have Price's lines put in his deed, but it no where appears that Gardiner informed her this had been done when the deed was presented for execution by her, and the fact that his father-in-law's advice led to the insertion of the Price lines, is strong presumptive evidence that Gardiner would otherwise not have inserted these lines, and that he understood lot No. 184 did not in fact embrace any part of Lot J.

We find no error in the decree disposing of the fund before the Court.

> *Decree affirmed with costs in this Court to the appellee, but each party is to pay its respective costs below as provided by the decree of the Circuit Court No. 2, of Baltimore City.*

(Decided January 15th, 1903.)